

**U.S. Department of Justice**

*United States Attorney*
*Northern District of New York*

*445 Broadway*

*Room 218*
*Albany, New York  12207*
*(518) 431-0247*

June 6, 2008

Hon. Frederick J. Scullin, Jr.
Senior United States District Judge
100 South Clinton Street
Syracuse, NY 13261-7367

      Re:    **United States v. Roger Robare**  07-CR-373 (FJS)

Dear Judge Scullin:

      Please accept the enclosed Government Response in Opposition to all pending defense motions.

                    Very truly yours,

                    Glenn T. Suddaby
                    United States Attorney's Office

By:     /S/_____
                    Robert A. Sharpe
                    Assistant U.S. Attorney

The Government is aware that it has not complied with the deadlines in responding to the motions. There is a lot here and we ask that the Court accept this response to what we believe are all of the pending motions. Generically, as will be outlined in greater detail herein we believe that the majority of arguments made and issues raised are without merit. However, there are some issues which need to be further addressed and resolved.

## FIRST SUPPRESSION MOTION

When still represented by counsel the defendant moved to suppress evidence, including the gun and statements. See DKT 10. The Government submitted it's response, withdrawing it's notice of intent to offer statements allegedly attributable to the Defendant. See DKT 14. A Suppression Hearing was conducted on January 16, 2008 and the Defendant's motion was subsequently denied via written Order of the Court. DKT 25.

During the pendency of this case, while previously represented by Timothy E. Austin, Esq., Assistant Federal Public Defender, Robare subsequently petitioned the Court to discharge counsel and represent himself, pro se. That application was granted, however, the Court appointed the AFPD to assist the defendant as "stand-by" counsel. See Text Order (docket) dated February 13, 2008.

## DKT 35

On February 25, 2008, in a motion dated February 11, 2008, the Defendant filed an additional Omnibus Motion seeking review of the grand jury minutes and dismissal of the indictment. DKT 35.

The Government filed it's response on March 7, 2008, opposing the motion. DKT 36. There were a variety of issues which arose regarding the defendant's location (what jail he was in) and the Defendant received the response to that motion on or about March 21, 2008. See DKT 39,40, 44 and DOCKET ANNOTATIONS dated February 25, 2008, March 5, 2007, and March 27, 2008.

The Court ruled upon that motion (DKT 35) and the denied the Defendant's applications. See DKT 45, issued on April 1, 2008. Amidst the confusion as to when precisely the defendant was moved from Jamesville to Albany, the Court provided the defendant with additional time until April 14, 2007, in which to submit a response to the Government's Response in Opposition to the motion (motion: DKT 35; Govt Response: DKT 36). See TEXT ORDERS (docket) dated March 27, 2008 and April 2, 2008.

No response from the defendant replying to the Government's Response in Opposition was filed by April 14, 2008.

**DKT 37**

An additional motion for Omnibus Relief dated March 7, 2008 and filed (or entered on the docket) on March 17, 2008 was filed by the Defendant.  DKT 37.  That motion encompassed a request by the defendant for various items, whether or not discoverable under or encompassed within Fed. R. Crim. P. (hereafter, FRCP) 16.  By it's form, content, or legal basis in support of the motion, it is unclear whether the motion also encompassed a motion to compel discovery.  Additionally, the motion (or letter) made the Court aware of items or assistance requested by the Defendant of or from stand-by counsel (at page 3), in regards to, in part, a possible motion to secure depositions from possible defense witnesses under FRCP 15(a)(1).  Also, the motion referenced possibly seeking a Bill of Particulars under FRCP 7(f) as it related to information sought from the government (also at page 3).

Next, the Defendant filed a letter with the Court dated March 12, 2008 but entered in the docket on March 19, 2008, which was listed as a "motion to compel" but which appeared to relate to the fact that the Defendant had not yet received the Government Response that had been filed and mailed on March 7, 2008, and which was mailed again on March 18, 2008, to both Jamesville and Albany, and to stand-by counsel, when the government learned that the Defendant had not yet been moved to Albany.  It was previously mailed to the Defendant at Albany and electronically filed (copy to stand-by counsel) on March 7, 2008.  See DKT 41.

On April 18, 2008, the government mailed a number of items to the Defendant with additional copies of those materials sent to stand-by counsel.  See DKT 50. The items provided to the Defendant and stand-by counsel were set forth in that letter, with a copy of the letter provided to the Court.

In summary, thus far, the Government submitted it's response (DKT 36), to Defendant's Motion (DKT 35), which the Court denied (DKT 45).  The Defendant was provided with additional time in which to submit any response to the Government's Response in Opposition, which he did not initially do by April 14, 2008 (he received the Government's response on or about March 21, 2008- see DKT 44).

The Government has already responded to DKT 35 and DKT 37.  The motion under DKT 35 has already been ruled upon by the Court and denied.  DKT 45.  In DKT 37 the defendant requested items and materials which in the government's judgement exceed the scope of our discovery obligations under FRCP 16.  Regardless, our letter of April 18, 2008 (DKT 50) sets forth what we provided copies of anyway.  It was unclear to the Government whether DKT 37, or part of that letter, was a request for a Bill of Particulars or a declaration that should he not receive the materials he was requesting, that he would file a Bill of Particulars.  In our view, the letter appeared to be the latter so we sent the materials along with the April 18, 2008 letter, which included, for example, an explanation of where the ammunition, which is the subject of Count 4 of the Superceding Indictment, was located.

2

Otherwise, absent further directive from the Court we decline to provide a Bill of Particulars under FRCP 7(f) and do not believe the Defendant is entitled to one.  Should the Defendant otherwise feel that he is entitled to something more than what he has already been provided with, the Court will have to address such concerns at the June 25, 2008 appearance it has scheduled for argument on all pending motions.

Some of the motions, or parts thereof, filed by the Defendant are difficult to discern.  For example, within DKT 37, it is unclear whether the defendant is making a motion for or contemplating some future motion, that the Court order pre-trial depositions to be used at trial of prospective defense witnesses.  (In a later motion the defendant seeks a Court Order to interview other witnesses).  These issues appear to have been addressed by the Court via various TEXT Orders within the docket that should the Defendant feel he is entitled to various relief that he needs to make the requisite showing via submitted motion.

It does not appear to the Government that there is anything further to address within Defendant's letter/motion DKT 37.  Relatedly, it does not appear that there is anything further to address as pertaining to Defendant's letter/motion DKT 41, which was addressed when the defendant received the Government's Response (DKT 36), which was first filed and mailed to him (and sent to stand-by counsel via ecf) on March 7, 2008, but not received by him until or about March 21, 2008.

Next, the Defendant filed a letter/motion with the Court dated March 18, 2008 but entered on the docket on March 25, 2008, seeking materials from stand-by counsel and for issuance of an Order seeking leave for the Defendant to interview various witnesses, and for appointment of a forensic expert.  In regards to the confusion as to what jail the Defendant was in, and what he had done or had attempted to do on the Defendant's behalf, stand-by counsel wrote the Court on March 27, 2008, <u>see</u> DKT 44, and again on April 1, 2008, <u>see</u> DKT 46.

In regards to those requests the Court issued a TEXT ORDER on April 2, 2008, denying the Defendant's application for leave to depose and/or interview certain witnesses and to retain a forensics expert.  Within that Order, the Court indicated that "the defendant must file a motion requesting this relief.  The motion must show good cause as to why the requested relief is necessary to his defense".

In the Government's view, the Court's TEXT ORDER of April 2, 2008 addressed those issues raised by the Defendant in DKT 42 and absent further directive from the Court to the contrary, we do not believe that any further action or response from us, is needed.

## DKT 43

Next, the Defendant submitted a letter/motion dated March 20, 2008, and entered in the docket on March 25, 2008, for reconsideration of the Court's Order (DKT 25) denying the Defendant's original Motion to Suppress Evidence.  See DKT 43 and Court's DOCKET

ANNOTATION dated March 27, 2008.  We had and have nothing to add by way of evidence beyond the response originally submitted and the memorandum of law attached thereto, and the presentation of evidence submitted by us at the January 16, 2008 suppression hearing, and the oral arguments made by us to the Court at the conclusion of the hearing.  To the extent that it has not already done so, we believe that the Court's original ruling should stand.  We see no basis, factual, legal, or otherwise, for the Court to find that the Defendant has meant any sort of threshold burden which would entitle him to reconsideration of the Court's original ruling and believe that any motion for reconsideration can and should be denied on that basis.

Additionally, there is nothing even meritorious in the positions espoused by the Defendant.  As with our original response to the Defendant's motion, we refute any factual allegations made by him.  Whether it be this "motion for reconsideration" of the Court's denial of his originally filed suppression motion, or parts of other subsequent motions filed by him during the pendency of this case, at various times the Defendant attempts to relitigate arguments previously made by him and already ruled upon by the Court.  Also, factually oftentimes his arguments can be difficult to follow.  For example, if the Court recalls from the original motion to suppress the Defendant submitted an affidavit under penalty of perjury that the camper belonged to him.  The Court heard testimony, which it apparently credited, from the Defendant's sister, that the camper belonged to her and that she allowed the Defendant to stay there the night before his arrest.  She admitted that she had previously testified under oath at a state preliminary hearing and before a state grand jury, that the camper was her brother's, but she explained she had lied and gave reasons why she had done so.  There is nothing new in the Defendant's motion for reconsideration and nothing contained therein that was not already argued on his behalf by counsel (or under even a different standard, there is nothing in the Defendant's motion for reconsideration that could not have been argued in the original motion).  In the Government's view, the factual and legal arguments made by the Defendant in the motion for reconsideration merely parrot what was already previously argued.  In his motion for reconsideration and in other parts of motions later filed by him he wants to revisit the issues surrounding the camper and seems to argue that his sister was still lying and that the camper is actually his.  In other parts of his motions he appears to make somewhat nuanced distinctions and concedes that while the camper belonged, or might have belonged, to his sister, and that by allowing him to stay there the night before, he had an expectation of privacy in the camper.  He seems to argue at various times that any expectation of privacy he might have had in the camper superceded any rights, interest, or expectation of privacy his sister might have had, such that she could not give consent to the police to search the camper.

The point is, this is what was originally argued on his behalf in his original motion to suppress.  This is what was already considered and rejected by the Court in connection with it's previously issued Order denying his motion.  In part, his argument seems to be that he had an expectation of privacy and therefore had standing to move to suppress the gun that was found in the camper.  He already was allowed to argue that and his motion was denied.  Moreover, as was raised by the Government in oral argument following the hearing, the sister indicated to police that she owned the camper and gave her consent for them to search it.  The police reasonably

4

relied on and acted in good faith on that representation.  As the Court recalls, the Defendant also tried to argue that her consent was coerced, which was also apparently rejected by the Court.

A "motion for reconsideration", of whatever kind, "is not a mechanism to allow parties to relitigate contentions and arguments already briefed, considered, and decided".  Minicone v. United States, No. 5:89-CR-173, 2007 WL 2572119, at *1 (N.D.N.Y. Aug. 31, 2007) (Munson, S.J.) (Quoting Yankelvitz v. Cornell University, No. 95 CIV. 4593, 1997 WL 115651 at *2 (S.D.N.Y. Mar. 14. 1997)); see also, Henderson v. Metropolitan Bank & Trust Co., 502 F.Supp.2d 372, 376 (S.D.N.Y. 2007) ("[a] court should deny a motion for reconsideration when the movant seeks solely to relitigate an issue already decided") (internal quotation, citation and footnote omitted); Edwards v. United States Dept. Of Agriculture, No. 04-CV-6051L, 2007 WL 700898, at *1 (W.D.N.Y. Mar. 1, 2007 (motion for reconsideration is not intended as a "vehicle for a party dissatisfied with the Court's ruling to advance new theories that the movant failed to [previously] advance") (internal quotation and citations omitted).

In the instant case, the government asserts that the Defendant's motion for reconsideration in DKT 43 should be denied by the Court.  We do not believe that he is entitled to a hearing on the matter.  The Defendant has cited no law to support the proposition that he is entitled to bring, or that the Court might consider, a motion for reconsideration of a Decision already made by the Court, denying a motion already made by him, the subject of a hearing already conducted.  In addition to a paucity of law which would permit filing of such motion and consideration thereof, neither has the Defendant set forth any facts which would entitle him to bring such motion, or entitle him to relief thereunder.  There is no new law cited herein; there are no new facts alleged herein.  There are no allegations setting forth why any legal or factual arguments in support of his motion could not have been made or were not made previously as part of his earlier motion.  Lastly, as was already decided by the Court, the Defendant's contentions are without merit in view of it's finding that the Defendant's sister could give consent and did so, and as the Government also argued, that the police reasonably relied on and acted in good faith on the representations made by her to them.  For these reasons, other than the Court's denial of the motion we do not believe that anything further is required in regards to Defendant's DKT 43.

### DKT 47

Next, the Defendant filed a motion to dismiss dated March 28, 2008 and entered on the docket on April 1, 2008.  DKT 47.  The Defendant has moved for dismissal of the Indictment and in the first instance, argues that 18 U.S.C. § 922(g)(1) (Counts 1 and 4) is unconstitutional and has no connection with interstate commerce.

The law is quite clear on this point.  Constitutional challenges to 18 U.S.C. 922(g) based on a lack of sufficient nexus with interstate commerce in reliance on the Supreme Court's decision in United States v. Lopez, 514 U.S. 549 (1995), have uniformly failed.  See United States v. Rawls, 85 F.3d 240, 242 (5th Cir. 1996) (joining all other circuits that have considered

issue in rejecting <u>Lopez</u>-type challenge to § 922(g)(1); citing other decisions); <u>United States v. McCallister</u>, 77 F.3d 387, 390 (11th Cir. 1996) (rejecting <u>Lopez</u>-type challenge to § 922(g)(1)); <u>United States v. Turner</u>, 77 F.3d 887, 889 (6th Cir. 1996) (noting that every appeals court "has held that the jurisdictional element of § 922(g) provides the requisite nexus with interstate commerce that § 922(q), [the statute at issue in <u>Lopez</u>,] lacked"); <u>United States v. Bell</u>, 70 F.3d 495, 498 (7th Cir. 1995) (rejecting <u>Lopez</u>-type challenge to § 922(g)(1)).  Every Court of Appeals has now rejected such a challenge.  <u>Fraternal Order of Police v. United States</u>, 173 F.3d 898, 907 & n.2 (D.C. Cir. 1999) (rejecting commerce clause challenge to § 922(g)(9), and citing decision from each numbered circuit rejecting post-<u>Lopez</u> challenge to § 922(g)(1), <u>cert. denied</u>, 528 U.S. 1197 (1999); <u>United States v. Williams</u>, 128 F.3d 1128, 1133-34 (7th Cir. 1997) (citing decisions from every other numbered circuit rejecting such challenge).

The evidence in the case is that neither the firearm in Count 1 nor the ammunition in Count 4 were manufactured in New York.  More specifically, in regards to the firearm information has been provided to the Defendant that it was manufactured in Norwich, Connecticut.  Moreover, the following is the legal instruction this Court provided to the trial jury in <u>United States v. Anthony Billups</u>, 06-CR-346 (FJS), a federal firearms trial presided over by the Court involving a 18 U.S.C. § 922(g)(1) charge.  It is the same jury charge regarding this element of the offense that has been given by Judges Kahn, Hurd, McAvoy and Mordue in the Northern District of New York, in other federal firearms trials.

"The third element that the government must prove beyond a reasonable doubt is that the Defendant's possession of the firearm in Count 1 was in or affecting **either interstate or foreign commerce**.  The term "in or affecting commerce" simply means that the firearm must have had some minimal link to **either** interstate or foreign commerce.  This element is satisfied if it is established beyond a reasonable doubt that at some time during the existence of the firearm, the firearm moved across either a state line or an international boundary.  Thus, if it is established that the firearm in Count 1 was previously in a state other than New York, or in a foreign country, and then was possessed by the Defendant in New York, then this element has been satisfied.

It is not necessary for the government to prove that the Defendant purchased the firearm in some other state and carried the firearm into New York.  Nor must the government prove who purchased the firearm or how it arrived in New York.  In addition, the government does not have to prove that the Defendant knew that the firearm had crossed state or national boundary lines.  All that is required is proof that the firearm in Count 1 had traveled, at some point during it's existence, in either interstate or foreign commerce by moving across a state or national boundary line at any time prior to the Defendant's alleged possession of the firearm."  <u>Scarborough v. United States</u>, 431 U.S. 563, 566, 575-578 (1977); <u>United States v. Gillies</u>, 851 F.2d 492, 493-496 (1st Cir. 1988); <u>United States v. Sutton</u>, 521 F.2d 1385, 1391 (7th Cir. 1975); Edward J. Devitt Et Al., <u>Federal Jury Practices and Instructions</u>, § 36.14 (4th ed. 1990); Leonard B. Sand Et Al., <u>Modern Federal Jury Instructions</u>, No. 35-55 (1993).

6

Where the firearm or ammunition was not manufactured in New York, as is the case here, this element is satisfied, and the Defendant's motion should be denied, without a hearing.  United States v. Carter, 981 F.2d 645, 647 (2d Cir. 1992); United States v. Sorrentino, 72 F.3d 294, 296 (2d Cir. 1995); United States v. Trzaska, 111 F.3d 1019, 1028 (2d Cir. 1997).

Also in his motion, the Defendant argues some application of "spousal privilege".  In regards to the underlying facts, as the government expects at trial, there was an argument between the Defendant and his wife, wherein she alleges that she was assaulted by him, that he would not allow her to call for help, and that he did not permit her to leave until the following day at which time she went to the hospital and reported the assault.  She indicated that during the incident he pulled out a gun, which he threatened to shoot himself with.

In our view, there is no protected privilege here under either state or federal law.  The Defendant argues in part that it is "a violation of state law for a spouse to disclose confidential communications".  Here, we do not agree with Defendant that state and not federal law applies.  First, the Defendant cites 28 U.S.C. § 2076, which contained the procedure for the promulgation of the Federal Rules of Evidence.  That section was repealed in 1988 by Title IV of the Judicial Improvements and Access to Justice Act (Pub.L. 100-702).

Under federal law, Rule 501 of the Federal Rules of Evidence provides in relevant part that "[e]xcept as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience."  Federal common law recognizes two distinct forms of marital privilege: (1) the privilege against adverse spousal testimony which invests the testifying witness the privilege of not being compelled to testify against one's spouse (Trammel v. United States, 445 U.S. 40 (1980) (which is neither applicable to the case here, nor even argued by the Defendant), and (2) the confidential marital communications privilege which may be asserted by either spouse to bar the testimony of the other regarding marital communications made in confidence (see, e.g., Wolf v. United States, 291 U.S. 7, 14 (1934) ("The basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marital relationship as to outweigh the disadvantage to the administration of justice which the privilege entails."))

The Defendant pulling out a gun during an argument is not a privileged confidential communication.  His actions and conduct do not involve any statement or communication made by him as she subsequently described what he did and what she observed.

The Defendant argues that state law is applicable and not federal law.  The government does not believe that to be so.  Regardless, him pulling out a gun and her later describing that to police is not remotely a privileged confidential communication.

7

The law as to whether state or federal law applies is also related to the third issue that the Defendant raises in this motion.  The Defendant moves to suppress recorded conversations made of telephone calls made by him to others when he was incarcerated in the Jamesville Correctional Facility as violative of his constitutional rights.  First, the Government has not provided notice of it's intent to use any of these conversations as direct evidence in it's case-in-chief at trial.  The background of these recordings is set forth in the docket in DKT 29 (letter from counsel to the Government) and DKT 30 (Government's response).  For purposes of this response, the Government asserts those facts set forth in our response to counsel (DKT 30).  Related to this initial point, there does not necessarily appear to be some "ripe" issue whether the Government does not intend to use the contents of any of those conversations in it's direct case.  However, it seems entirely appropriate to respond this issue nonetheless.  For, if the Defendant raises some issue in his Opening statement, or through his cross examination of Government witnesses, or through evidence presented as part of his direct case should there be any, which is contradicted by the contents of any conversation contained within those recordings, it would be the Government's intention to possibly use them as rebuttal evidence or some other capacity, if appropriate.  Accordingly, it may be that resolution of this issue is needed.  It may be that the Court finds it appropriate to address should the issue arise at trial and it might otherwise be that the Court elects to resolve this issue pre-trial.  We assert those facts set forth in DKT 30 and incorporate them as part of our response, here.  It is likely that a hearing would need to be conducted for the Court to make a determination as to whether it credits the facts as outlined by the Government.  If it does, it seems to the Government that the recorded conversations would be admissible.  It may be that a pre-trial hearing is not necessary should this issue not arise during the course of the actual trial.

The facts as alleged by the Government are set forth in DKT 30 but we do offer brief summary here.  The Defendant had been initially in custody in the Albany County Jail, which does not typically in the course of business record outgoing conversations of inmates.  The Government did not record any conversations of the Defendant while in Albany nor did we make any request to attempt to do so.  Neither did we make any request to have the Defendant moved to some other facility where that was done.

Prior to the January 16, 2008 suppression hearing we were contacted by the Defendant's sister who indicated she had heard from the Defendant's aunt that the Defendant had been released from custody and that she had been receiving calls from Defendant from a "315" area code.  The Government ascertained that the Defendant was not out of custody but had been moved by the U.S. Marshals to the Jamesville Correctional Facility in anticipation of the January 16, 2008 Suppression Hearing in Syracuse, NY.  That was done by the Marshals and was not requested by the Government.  We did not know that had even been done.

We then inquired of jail officials at Jamesville if they regularly recorded inmate outgoing calls and if some notice was provided to inmates of that being done.  We were informed that it was regularly done at Jamesville and that both written notice was posted and that there was an additional warning that was given on the phone when calls were made.

The Defendant's outgoing phone calls were then recorded by Jamesville officials and those recordings were placed on CD.  The Government made arrangements to have what we call a separate "taint" agent listen to the recordings.  She was provided with the telephone number of the Defendant's attorney and told not to listen to those calls.  She was told to listen to the other calls and to notify the AUSA and investigative case agent if there was any information that might be ov evidentiary value to the case.  The Government submits that the recording of those calls did not violate the Defendant's constitutional rights and that they are otherwise admissible depending on what develops during the course of trial.

Title III generally forbids the intentional interception of wire communications, such as telephone calls, when done without court-ordered authorization.  18 U.S.C. § 2510-2522.  An unlawfully intercepted telephone call may not be offered as evidence in any trial.  See 18 U.S.C. § 2515 ("Whenever any wire or oral communication has been intercepted, no part of the contents of such communication ... may be received in evidence in any trial ... if the disclosure of that information would be in violation of this chapter.").

Title III allows for certain exceptions, however.  Among them, the statute provides that "[i]t shall not be unlawful ... for a person acting under color of law to intercept a wire, oral, or electronic communication, where ... one of the parties to the communication has given prior consent to such interception."  18 U.S.C. § 2511(2)(c).  Consent may be either express or implied.  United States v. Amen, 831 F.2d 373, 378 (2d Cir 1987), cert. denied, 485 U.S. 1021 (1988).  The Second Circuit has long recognized that, under certain circumstances, prisoners are deemed to have given consent for purposes of Title III to the interception of their calls on institutional telephones.  Workman, 80 F.3d at 693; see, United States v. Willoughby, 860 F.2d 15, 19-20 (2d Cir. 1988), cert. denied, 488 U.S. 1033 (1989); see also, Amen, 831 F.2d at 378-79.

For example, in Amen, the Second Circuit held that inmates impliedly consent to have their telephone conversations monitored where they have received notice of the surveillance and nevertheless use the prison telephones.  831 F.2d at 378-79.  In Amen, the notice consisted of federal prison regulations clearly indicating inmate telephone calls were subject to monitoring, an orientation lecture in which the monitoring taping system was discussed, an informational handbook received by every inmate describing the system, and signs near the telephones notifying inmates of the monitoring.  Id.  In Willoughby, the Second Circuit similarly held that a combination of notification at an orientation lecture and signs near the telephone explaining the policy was sufficient to justify the inference of consent by prisoners who used the phones.  860 F.2d at 20.

Under the facts of Workman, the defendant was "given somewhat less notice than the inmates in Willoughby and Amen", but the Court found that "he had sufficient warning of the monitoring program" and "that his use of the telephones implied consent to the surveillance."  80 F.3d at 693.  In Workman, one of the multiple defendants in that case, Green, argued that he had not been specifically told that his use of the telephones constituted consent.  The Court noted that

9

Green misunderstood it's reasoning in Amen and Willoughby, in which the Court inferred consent from circumstances indicating that the prisoner used the telephone with awareness of the possible surveillance. See, Amen, 831 F.2d at 378. "The legislative history [of Title III] shows that Congress intended the consent requirement to be construed broadly." Id.; see, S.Rep.No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 2112, 2182. When an inmate has repeatedly received notice that calls placed on prison telephones are subject to surveillance, the evidence indicates that he is in fact aware of the monitoring program, and he nevertheless uses the telephones, by that use he impliedly consents to be monitored for purposes for Title III. Workman, 80 F.3d at 693-94; Amen, 831 F.2d at 379 (where "defendants had notice of the interception system ... their use of the telephones ... constituted implied consent of the monitoring").

Courts have also held that law enforcement officers need not follow the warrant procedure of Title III when monitoring prisoners' phone calls as long as monitoring occurs "in the ordinary course" of their duties. See, e.g., U.S. v. Lewis, 406 F.3d 11, 19 (1st Cir. 2005) (routine monitoring of inmate conversations not Title III violation); U.S. v. Friedman, 300 F.3d 111, 122-23 (2d Cir. 2002) (correctional officers' warrantless interception of jail inmate's phone calls not Title III violation if pursuant to local facility rules); U.S. v. Hammond, 286 F.3d 189, 192 (4th Cir. 2002) (correctional officers' warrantless interception of prisoner phone calls not Title III violation if pursuant to well-known policy of Federal Bureau of Prisons); U.S. v. Paul, 614 F.2d 115, 117 (6th Cir. 1980) (same); U.S. v. Sababu, 891 F.2d 1308, 1328-29 (7th Cir. 1989) (same); U.S. v. Peoples, 250 F.3d 630, 637 (8th Cir. 2001) (correctional officers' warrantless recording of prisoner's conversations not Title III violation because monitoring policy was part of "ordinary course" of business); U.S. v. Van Poyck, 77 F.3d 285, 291-92 (9th Cir. 1996) (correctional officers' warrantless recording of prisoner's phone calls not Title III violation because monitoring policy was part of "ordinary course" of business); Smith v. U.S. Dept of Justice, 251 F.3d 1047, 1050 (D.C. Cir. 2001) (routine monitoring of inmate conversations not Title III violation).

## Federal and State Constitutional Rights

In Workman, supra, another of the multiple defendants, Rodgers, argued that his Fourth Amendment rights were violated when prison officials recorded his conversations with another defendant (Green). The Second Circuit rejected that argument. 80 F.3d at 694. However, Rodgers also argued that the telephone recordings made by prison officials, if not violative of his Fourth Amendment rights under the U.S. Constitution, violated his rights under parallel provisions of the New York State Constitution. (N.Y. Const. Art. I, § 12 (guaranteeing "[t]he right of the people to be secure against unreasonable interception of telephone ... communications"). The Second Circuit held that it need not address the issue whether the defendant properly construed the State Constitution. In that case, which obviously involved recorded telephone conversations between inmates and noninmates, the Court cited United States v. Pforzheimer, 826 F.2d 200 (2d Cir. 1987), where the defendant there argued that the fruits of a search conducted by state officials pursuant to a state court warrant should be suppressed in a

federal prosecution where a more stringent state constitutional rule would have required suppression, even though the evidence was admissible as a matter of federal constitutional law. In Pforzheimer, the Second Circuit held that the evidence was admissible where seized by state officers and where it was subsequently offered in a federal criminal proceeding and that the seizure need not satisfy state law requirements.  Id. at 204.  See also, United States v. Smith, 9 F.3d 1007, 1014 (2d Cir. 1993) ("touchstone of a federal court's review of a state search warrant secured by local police officials and employed in a federal prosecution is the Fourth Amendment and its requirements, and no more"); United States v. Rowell, 903 F.2d 899, 901-02 (2d Cir. 1990). Cf. United States v. Brown, 52 F.3d 415, 426-27 (2d Cir. 1995), cert. denied, 516 U.S. 1068 (1996).

        In Workman, as pertaining to defendant Rodgers, the defendant argued that evidence procured by a state official should be excluded from a federal prosecution if the state official failed to conform to state constitutional standards.  There is no such requirement for admissibility of evidence in a federal criminal prosecution.  Workman, 80 F.3d at 694-95; see also, United States v. Butera, 677 F.2d 1376, 1380 (11th Cir. 1982) (tape recordings properly made by state officials pursuant to consent provisions of title III, 18 U.S.C. § 2511(2)©, admissible in federal prosecution even where state constitutional law would have required warrant), cert. denied, 459 U.S. 1108 (1983); United States v. Nelligan, 573 F.2d 251, 253 (5th Cir. 1978) (tape recording of conversation made with consent of one party in compliance with Title III admissible in federal prosecution despite state statute requiring consent of all parties to conversation).

        In Workman, the Court addressed an issue, which Mr. Robare has raised here primarily as it relates to his claim of "spousal privilege" protection.  Mr. Robare argues that his wife's allegation, that during a domestic assault, that he retrieved a gun which he threatened himself with, that this observation and her subsequent reporting that to police as she reported the assault, is a "privileged 'marital communication'", which the Defendant presumably is arguing she should be prohibited from testifying about.  Mr. Robare argues that state law is applicable here.  Amongst the cases cited by Mr. Robare is a case referred to by the Second Circuit in Workman.  In a footnote at page 694, the Second Circuit in Workman notes that it "recognize(s) a tension with United States v. Sotomayor, 592 F.2d 1219 (2d Cir.), cert. denied, 442 U.S. 919 (1979).  'In that case, we suggested that under the narrow circumstances where a state warrant was obtained in violation of 'state statutory requirements or standards that are designed to protect an individual's right of privacy,' Sotomayor, at 1225, 'federal courts would apply the state's statutory provisions even if they were more rigorous than the requirements of federal law.'" See also, United States v. Lilla, 609 F.2d 99, 102 n. 3 (2d Cir. 1983) (Lilla is also cited by Mr. Robare).

        In Workman, from 1996, the Second Circuit commented that the conclusion in Sotomayor, on that narrowly tailored issue, "is somewhat at odds with **our holdings in more recent cases**.  See, e.g., Rowell, 903 F.2d at 902 (which criticizes reasoning of Sotomayor) (emphasis added).  Furthermore, the Second Circuit in Workman noted, "It (Sotomayor decision) is also in conflict with the decisions of several other circuits."  See, Butera, 677 F.2d at 1380;

Nelligan, 573 F.2d at 253; United States v. Testa, 548 F.2d 847, 856 (9th Cir. 1977). Workman deals with the recorded conversations of inmates, which is an issue raised separately by Mr. Robare; rather, Mr. Robare argues that state law applies on his wife's observation of him with a gun which she later reports and describes to police and which he claims is privileged under New York law. In Workman, the Second Circuit commented "[W]e follow our recent- and more closely analogous-decisions in Rowell, Pforzheimer, and their progeny." 80 F.3d at 695.

        In United States v. Rowell, 903 F.2d 899 (2d Cir. 1990), the defendant made a pre-trial motion to suppress wiretap evidence on the ground that an eavesdropping warrant was not supported by sufficient probable cause. Specifically, the defendant argued that since the warrant was issued by a New York state court judge, that the district court should apply the more stringent New York standard for probable cause, not the federal "totality of the circumstances" standard. In Rowell, like in Pforzheimer, both cases dealt with the issue of "whether the state or federal exclusionary rule should be applied in ruling on a motion to suppress evidence in a criminal trial in federal court when the evidence in question was solely the product of a state investigation", and the Second Circuit concluded that "federal law should apply to ... federal criminal prosecutions, even though the underlying investigations were conducted solely by state officials." Rowell, 903 F2d at 901; see also, Pforzheimer, 826 F.2d at 204. Furthermore, in Rowell the Court cited United States v. Nersesian, 824 F.2d 1294, 1306 (2d Cir.), cert. denied, 484 U.S. 958 (1987), and applied federal law in determining the admissibility of evidence obtained under a state-issued warrant which authorized wiretapping by state and federal authorities. As noted by the Second Circuit in Rowell, this application of federal law to federal prosecutions, "flows directly from our prior decisions, (and) is supported by prior decisions of the Supreme Court." See, e.g., Preston v. United States, 376 U.S. 364 (1964) ("The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search had been made by federal officers."); Elkins v. United States, 364 U.S. 206, 224 (1960) ("The test [for admissibility of evidence] is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed."). The decisions of other circuits also support our conclusion. See, e.g., United States v. Quinones, 758 F.2d 40, 43 (1st Cir. 1985) ("[I]n federal prosecutions evidence admissible under federal law cannot be excluded because it would be inadmissible under state law."); United States v. Combs, 672 F.2d 574, 578 (6th Cir.), cert. denied, 458 U.S. 1111(1982) ("[S]tates are not free to impose on Federal courts requirements more strict than those of the Federal laws or Constitution." Policy considerations, particularly, a concern for the 'uniformity of criminal evidentiary jurisprudence in the federal courts,' Pforzheimer, 826 F.2d at 203 (citing Olmstead v. United States, 277 U.S. 438, 469 (1928), overruled on other grounds, Katz v. United States, 389 U.S. 347, 352 (1967), further support the application of federal law in federal criminal prosecutions which rely on state investigations." Rowell, 903 F.2d at 902.

        In Rowell, like Mr. Robare's case here, the defendants cite "the dicta in Sotomayor, 592 F.2d 1219, 1224-26, that applying the federal standard in the face of a stricter state standard might encourage forum shopping by state authorities." Rowell at 902. As the Court noted in

<u>Rowell</u>, this argument was already rejected in <u>Pforzhemier</u>, 826 F.2d at 204, "[A] state prosecutor whose case relies on evidence that may be inadmissible in a state court trial has no power or authority to a effect a prosecution in federal court. The initiation of a federal prosecution depends entirely on the discretion of the federal prosecutor ... [and we] should presume that the [federal] prosecution was pursued in good faith execution of the law."

In the following cases, courts explicitly stated that under FRE 501, the question of marital privilege in a federal criminal case is governed by federal common law. <u>See</u>, <u>United States v. Kole</u>, 442 F.Supp. 852 (S.D.N.Y. 1977); <u>United States v. Panetta</u>, 436 F.Supp. 114 (E.D.Pa. 1977); <u>United States v. Lilley</u>, (8th Cir. 1977); <u>United States v. Lustig</u>, 555 F.2d 737 (9th Cir. 1977); <u>United States v. Koehler</u>, 790 F.2d 1256 (5th Cir. 1986). Moreover, under federal law there is also an exception where the privilege might otherwise apply where an offense was committed against a witness-spouse. <u>United States v. Cameron</u>, 556 F.2d 752 (5th Cir. 1977); <u>Ryan v. Commissioner</u>, 568 F.2d 531 (8th Cir. 1975). Under 501, courts have held that the privilege was limited to utterances or expressions intended to convey a message.

## DKT 51

Mr. Robare filed an additional Motion to Dismiss, DKT 51, dated April 17, 2008, and entered on the docket on April 21, 2008. He had been arraigned on the superceding indictment on April 4, 2008. A new motion schedule was issued for the "new" counts in the indictment (Counts 2 and 4) but the Court indicated that the "old" motion schedule (issued October 3, 2007 and any previously issued deadline extensions related thereto) applied to the counts carried over from the original indictment (Counts 1 and 3). Frankly, looking at the docket it is difficult to discern whether this motion complies with the issued scheduling orders. It is similarly difficult, at least for the Government, to tell whether this is a motion relating to the "new" charges in the superceding indictment or something that relates to the earlier counts. Moreover, much of the arguments raised in this motion, were raised in earlier motions. Some of the issues raised herein appear to have been previously raised in DKT 35 and already ruled upon and denied by the Court in DKT 45. In parts of this motion, it is hard to tell what the Defendant is asking for and upon legal or factual basis he claims entitles him to relief.

For example, in no particular order, at page 13 and 16-20, he appears to essentially repeat his previously made argument that 18 U.S.C. 922(g)(1) is unconstitutional. That argument is addressed above and should be denied. The Government does believe that it is necessary to conduct a hearing. The Defendant makes a series of baseless allegations both against the legitimacy of the initial state charges and the vitality of existing federal charges. He's got the state court "prosecutrix" "seducing" somebody in his first argument alleging lack of evidence, accusing state officials (prosecutor and police) of misconduct. He again argues, as he earlier did, that the initial state charging instruments contained what he alleges are intentional lies and misstatements, that the officer based an accusatory instrument on "direct knowledge", that the gun was mistakenly identified as .20 caliber, that the state prosecutor improperly (he claims) presented the case to grand jury when the complaint was dismissed at a preliminary hearing, that

13

there was something improper abut the camper not being listed in the warrant.

The Government chooses not to go through each and every argument of the Defendant in his motion.  His arguments do not appear to have been raised in a timely fashion as they do not appear to adhere to the Court's scheduling order subsequent to his arraignment on the superceding indictment and relate to original counts.  They also appear to be baseless and without merit.  Much of his arguments also appear irrelevant to the pending federal charge.  For example, it is clear from any number of the motions filed that he would like or wants to tell a federal trial jury that the initial criminal complaints filed against him in state court were dismissed by a local criminal court justice.  He does not "finish" that argument or thought but we presume he wants to argue or suggest or ask them to infer that there must be no basis for the validity of the pending federal charges in view of the town justice's decision.  We fail to see how legally that would be proper and how he would be allowed to do that in as much as that it not relevant to the federal proceeding and usurps the function of the trial jury to determine whether the government sustains its burden of proving the elements of the offense he has been charged with beyond a reasonable doubt.

As a former state court prosecutor and having some familiarity with New York State Criminal Procedure, we reject essentially all of his contentions of what he believes is allowable or improper under New York law.  Regardless, we submit to this Court that his complaints about state court charging instruments, state preliminary hearings, state presentation of evidence before a state court grand jury, and a state indictment, have no bearing on the pending federal indictment.  Moreover, some of these argument were already addressed by the Court in its earlier denial of a previous motion.  See DKT 45.

The Defendant also appears, at page 13, to demand a hearing in which the Government must prove that the Defendant was indicted for a shotgun which actually exists.  It seems to the Government that is a trial issue and part of the Government's proof.  As it relates to any motion by the Defendant regarding sufficiency of the Indictment, the Defendant previously made similar arguments which were denied by the Court.  DKT 35 and 45.

This is a difficult motion to respond to.  It is a "hodge-podge" of complaints.  We deny his allegations.  We deny his subjective interpretation of facts and characterization of evidence as matters properly within the province of the trial jury to resolve.  We assert that he has not set forth sufficient facts nor cited appropriate law that would entitle him to either a hearing on the issues raised nor relief therefrom.

## DKT 52

_____In a letter from the Defendant dated April 6, 2008, and entered on the docket on April 22, 2008, he seeks to clarify an earlier submission.  He states that he does not want to depose prosecution witnesses.  He wants to interview them and apparently wants the Court to make that happen.  In a TEXT ORDER dated April 22, 2008, as Court previously indicated in it's April 2, 2008 Order, the Court directs that Defendant can file a motion setting forth a factual and legal

14

basis that would permit that.  It does not appear that any response from the Government is needed.

## DKT 53

It is difficult to discern what the letter from Mr. Robare dated April 14, 2008 and entered on docket 4-22-08 might be construed as, whether it's a motion to compel.  The Government notes that it believes that the requests made were addressed by the Government with the materials it sent to the Defendant in it's letter dated April 18, 2008.  See DKT 50.  We assert that we have complied with our discovery obligations and that if Mr. Robare has additional concerns or believes he is entitled to additional materials, that he raise those issues with the Court on June 25, 2008 at the scheduled appearance.

## DKT 54

This motion dated April 25, 2008 and entered on docket on May 1, 2008, appears to have been filed in response to the "new" scheduling order issued subsequent to the Defendant's arraignment on the Superceding Indictment and relates to the ammunition which is the subject of Count 4 (that is, a "new" charge).  As we understand it, Mr. Robare wishes to adopt the original Motion to Dismiss filed by his original counsel, Mr. Austin, which was DKT 10.  That motion was obviously already litigated and denied by the Court.  DKT 25.  It appears that he seeks to incorporate as part of this motion his previously filed "Motion for Reconsideration" (DKT 43).  The Court already ruled upon the original motion.  If it has not already ruled upon the Motion for Reconsideration, the Government's Response and/or position is set forth above.  We assert that the motion should be denied.  We ask that the Court consider our original response, the evidence adduced at hearing, and arguments made to the Court at and subsequent to the hearing.  We do not believe that it is necessary to conduct any hearing anew, since one was already conducted, and the Defendant cites no new facts.  We ask that the Court deny the "renewed" motion to the extent it accepts it and the Motion for Reconsideration of the Court's earlier denial of the motion.

## DKT 57

As previously stated in the earlier nearly identical motion filed by the Defendant, ruled upon and denied by the Court, wherein the Defendant chose not to previously file a response to the Government's response as it was directed to do so by the Court, the Government denies the Defendant's allegations. This motion to dismiss filed by the Defendant on May 1, 2008, and entered on the docket on May 2, 2008, is essentially the same motion as was previously filed by the Defendant (DKT 35) and denied by the Court (DKT 45).

Notwithstanding the earlier motion and decision, and not withstanding the mandates of the *Jencks Act* under 18 U.S.C. § 3500 and the Criminal Pretrial Order, the Government provided Mr. Robare with all the grand jury testimony of the witnesses for the original grand jury presentation on August 22, 2007, and from the January 31, 2008 presentation of evidence as it

related to the superceding indictment which was conducted before an entirely different grand jury. (The term of the old grand jury expired). Mr. Robare argues that armed with the specifics in the transcripts, which he did not previously have, that he has "new" specific and articulable information such that the Court should allow him to bring this motion. He acknowledges that he did not timely comply with the prior directive of the Court in which to file such motion. His motion is not timely; however, in view of his allegations of misconduct, subornation of perjury, and perjury, the Government wishes to respond, for those allegations are meritless.

There was no perjury by Agent Meeks and no subornation of perjury by the Government. Under federal law, an indictment may be based on hearsay evidence. Costello v. United States, 350 U.S. 359, 363 (1956). Here, in both proceedings, Agent Meeks outlined what he had done, what he had reviewed, who he spoke with, what those people said, and where their information came from. There was nothing misleading about the manner in which Agent Meeks provided the evidence in the case. In the second proceeding, the grand jury that heard the evidence as it related to the superceding indictment heard not only from Agent Meeks but also from Wendy Robare and her son, Kenneth Carte.

If an indictment is valid on its face, it is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence, or even evidence obtained in violation of the defendant's Fifth Amendment privilege against self-incrimination. United States v. Calandra, 414 U.S. 338, 345 (1974); United States v. Blue, 384 U.S. 251 (1966); Lawn v. United States, 355 U.S. 339 (1958); Costello v. United States, 350 U.S. 359 (1956). Other than privileges, the rules of evidence do not apply to grand jury proceedings. Rule 1101(d)(2), Fed. R. Evid; United States v. McKenzie, 678 F.2d 629, 632-33 (5th Cir. 1982). A grand jury may return an indictment based partly or solely on hearsay evidence. United States v. Ortiz DeJesus, 230 F.3d 1 (1st Cir. 2000); United States v. Brown, 574 F.2d 1274 (5th Cir. 1978); United States v. Newcomb, 488 F.2d 190 (5th Cir.), cert. denied, 417 U.S. 931 (1974). There is a presumption of regularity that attaches to all grand jury proceedings, and irregularity must be proved by a defendant, United States v. Wadington, 233 F.3d 1067 (8th Cir. 2000); United States v. Battista, 646 F.2d 237 (6th Cir. 1981).

Motions to dismiss indictment based upon claims of grand jury abuse through the knowing presentation of perjurious testimony, while frequently made, are rarely granted by the courts. See, e.g., United States v. Feurtado, 191 F.3d 420 (4th Cir. 1999); United States v. Mangual-Corchado, 139 F.3d 34 (1st Cir. 1998); United States v. Books, 125 F.3d 484 (7th Cir. 1997); United States v. Arana, 13 F.Supp.2d 613 (E.D.Mich. 1998). Absent a showing of prejudice to the defendant, federal courts generally may not dismiss an indictment for errors in grand jury proceedings. See Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity or variance that does not affect substantial rights shall be disregarded."); Bank of Nova Scotia v. U.S., 487 U.S. 250, 255 (1988). To establish prejudice, at least where nonconstitutional error is alleged, the defendant must show "'that the violation substantially influenced the grand jury's decision to indict,' or ... there is 'grave doubt' that the decision to indict was free from the substantial influence of violations." Bank of Nova Scotia, 487 U.S. at 256 (quoting U.S. v. Mechanik, 475

U.S. 66, 78 (1986).

Rather, these motions are judged against an exacting standard.  Before dismissal may be justified, it must be shown that the perjury was both knowing and "material."  United States v. Mangual-Corchado at 41-42.  Thus, a mere assertion that a single witness' statements were misleading or overstated the evidence will not vitiate an otherwise valid indictment.  See United States v. Yost, 24 F.3d 99, 142 (10th Cir. 1994).  Moreover, if sufficient truthful testimony exists to support the indictment, the indictment should not be dismissed because of alleged perjury before the grand jury, since it is presumed that the grand jury would have returned the indictment absent the perjurious testimony.  United States v. Clairborne at 791-92; United States v. Adamo, 742 F.2d 927 (6th Cir. 1984); United States v. Udziela, 671 F.2d 995, 1001 (7th Cir. 1984); United States v. Cathey, 591 F.2d 268, 271-72 (5th Cir. 1979).

Agent Meeks recited the facts as he understood them to be which as he indicated to the grand jury was based on his conversations with various state police officers involved in the investigation, as they described their conversations with various witnesses and the Defendant's wife, and as they described their conversations with other officers who were also involved in the investigation of the case.  Agent Meeks also indicated that he reviewed the reports that had been provided to him along with witness statements, which were put into evidence before the grand jury.  First, the government fails to see any distinction, much less any meaningful distinction, between what Agent Meeks told the grand jury about what the wife described occurred during the domestic assault "that during the course of an argument Defendant produced a firearm, put to his chin and threatened to kill himself."

According to Mr. Robare, Agent Meeks' testimony was accurate and misleading.  It is not.  That is exactly what the wife always described.  What Mr. Robare always seems to be arguing is that he disagrees with and denies the allegations, or that description of events.  It would seem to the Government that these issues are more appropriately the subject of cross examination by him of the witnesses as they testify at trial.  If Mr. Robare chooses to suggest or argue that what his wife previously described and what she presumably will testify to at trial, did not occur or did not happen in that way, then he can explore those questions through his cross examination, he can take the stand and offer evidence on his own behalf or call other witnesses, and he can argue whatever he likes during summation.

In his motion, Mr. Robare sets forth Agent Meeks' summary of the facts and then cites a portion of one of the statements provided by the wife and wants to engage in some kind of direct comparison.  The wife was in the hospital having been assaulted by the Defendant.  There was an initial statement by an officer who responded to that location.  In view of her condition and her treatment by hospital staff that conversation was of limited duration.  When she got out of the hospital she provided an additional statement providing additional details.  After the defendant was arrested and after the gun was found in the trailer, police made arrangements for her to be shown the gun to see if she could identify it and if she recognized it from the night of the assault.  While it is clear that the Defendant finds something conspiratorial in all this, or at least intends to

argue as much, again, those are issues to be dealt with at trial.

The Defendant seems to make some type of argument that Agent Meeks mislead the grand jury because he described the Defendant producing the weapon during the assault. While we are having difficulty following his train of thought, apparently Mr. Robare takes umbrage with that description or characterization because in one of his wife's statements she reports that "approximately one hour later when defendant placed a black-colored rifle to his chin and threatened to kill himself". His wife had described the argument, the assault, his ripping a phone out of the wall when she tried to call for help, and that he did not permit her to leave until the following morning. Based on her description of the incident, and again, not just in the statements she would have provided, but in the conversations she had with officers, we are assuming that she did not think that the incident was over simply when the defendant got done punching and throwing her around. It would seem that in the Defendant's mind the incident ends at that point in time. But again, she had described him pulling the phone out of the wall when she tried to call for help and his not allowing her to leave until the following day. So again, for the sake of repetition, we do not see how Agent Meeks mischaracterized what had occurred. We certainly discern no difference, much less any material distinction, where Mr. Robare apparently sees differences which he suggests substantially impaired the integrity of the grand jury proceeding and seeks to impugn the integrity of the presentation of evidence by the prosecution.

The Government suggests that while Mr. Robare wants to cite to his wife's statements, Agent Meeks testimony was based on his review of those statements, his review of police reports, and his conversations with some of the officers who were involved in the investigation. They recounted for him conversations they had with other officers, about details of the case, and interviews of witnesses. Agent Meeks was provided a summary of the case and what he had learned. Again, we deny Mr. Robare's allegations. We do not remotely agree with his characterization of the evidence, and more specifically, as it relates to his motion, his characterization of Agent Meeks' testimony.

Mr. Robare intersperses references to the initial grand jury presentation in which Agent Meeks was called as witness and which occurred on August 22, 2007 (which was a 2007 Wednesday Grand Jury) and the subsequent grand jury presentation when the indictment was superseded which occurred on January 31, 2008 in which Agent Meeks, Wendy Robare (the defendant's sister), and Ken Carte (the defendant's nephew) were called as witnesses. That evidence was presented to a 2008 Thursday-Friday grand jury. The earlier grand jury was no longer sitting and the two presentations were entirely separate.

Mr. Robare refers to testimony before the first grand jury, which was not part of the presentation of the evidence to the second grand jury, which returned an indictment against the defendant, and argues prejudice. At pages 6 and 7 of his motion Mr. Robare refers to Agent Meeks grand jury testimony from the initial presentation on August 22, 2007. Agent Meeks learned more as the investigation continued even after the indictment. Certainly, more information was developed as the suppression hearing was conducted on January 16, 2008, and

as Wendy Robare and police officers were interviewed in preparation of their hearing testimony. In the first instance, the government would suggest that his answer and description is accurate in that the Defendant was located in the camper which he had occupied previously and that it was owned by the Defendant's sister.  Agent Meeks certainly learned more as the investigation continued.  The facts were more fully developed at the later suppression hearing and they were more fully developed at the later grand jury presentation when an entirely different grand jury heard the evidence.  The testimony that Mr. Robare refers to was the earlier August, 2007 grand jury which the later 2008 grand jury that returned the later superceding indictment did not have before it.

It seems to the Government that there are some different issues here.  First, Agent Meeks summarized the evidence as he understood it to be.  The Government asked it's questions based on it's understanding of the evidence.  There was no intentional misrepresentation.  We dispute Mr. Robare's characterization that the evidence and answer given was a misrepresentation and intentionally given.  It was not.  The information was clearly more fully developed and detailed later, both at the suppression hearing and then at the later grand jury presentation when the Government spoke in greater detail with the witnesses in anticipation of their testimony at the January hearing.  For instance, it was obviously more clear at that time that the Defendant was arrested during the morning at the trailer, that nobody other than the Defendant had been there at that time, that the police left with the Defendant, applied for search warrants for the Defendant and his wife's home and the Defendant's car, that the search warrants were executed at those locations, and the police later returned to the sister's house where the Defendant had been arrested, had her come to the house from work, at which time they spoke to her and obtained her consent to search the trailer, at which time the firearm was located.  During the initial presentation in August Agent Meeks knew that the Defendant had been arrested in the trailer, that the firearm had been located there and that the sister gave consent to the search.

The Court is aware obviously that we have already provided the grand jury testimony of the witnesses.  Mr. Robare is a conspirarist and it seemed to the Government that the best course of action is to be completely transparent.  We do not believe that Mr. Robare has set forth a sufficient basis that would entitle him to a hearing on this issue.  If the Court thinks a hearing is necessary Agent Meeks is obviously available to testify as to what he knew and was told at various stages of the investigation.  These issues are repetitive in nature in terms of what Mr. Robare previously raised in an earlier motion (DKT 35).  He has indicated that he is renewing his application to make these motions, which he has already made, and which have already been denied to the Court, because he feels there is new demonstrable information contained within the minutes he has been provided.

The Government does not believe there is any change in circumstances gleaned from the minutes, which entitles him to relief, that is, dismissal of the indictment, or even a hearing.  If the Court feels that issues have been raised such that it would like to review the minutes, we will provide them to the Court.

Mr. Robare makes additional factual allegations which do not have merit. For example, at page 7 in footnote 5, while Mr. Robare argues to the Court that the Government should have informed the August 22, 2007 grand jury that his sister twice previously testified that the Defendant owned the camper, this argument seems disingenuous at best if not outright manipulative. As the Court and Mr. Robare both know, his sister, Wendy, testified at the January 16, 2008 suppression hearing. Both parties had been previously and simultaneously trying to obtain either transcripts or tapes of the state court preliminary hearing and the state grand jury minutes. In fact, the defense had an audiotape of the preliminary hearing before the prosecution obtained a copy for itself. Both parties, that is, the government along with counsel then representing Mr. Robare, made simultaneous application to the District Attorney's Office and the state court, to be provided with transcripts of witness testimony at the state grand jury.

The Government received those transcripts the morning of the January hearing. The Government's legal obligation in calling Wendy Robare as a witness, was to provide the defense with a copy of her previous testimony. However, we provided the defense with a copy of the testimony of all the witnesses who testified before the state grand jury. Neither the Government nor Agent Meeks had any knowledge of Wendy Robare's earlier testimony in state proceedings, when the case was first presented to the federal grand jury in August, 2007. The Government had no knowledge of what any of the witnesses testified to before the state grand jury, which is secret and protected, just like the federal grand jury, absent a court authorizing release of the minutes as it subsequently did upon application of the DA's Office, the defense, and the federal Government as the federal suppression hearing approached.

Mr. Robare's criminal history was reviewed before the grand jury establishing that he was a federally prohibited and could not legally possess firearms or ammunition. The Government submits there was nothing improper in this. Mr. Robare complains of the nature of the presentation of the evidence, particularly as contrasted with the presentation of evidence of prior convictions at the subsequent grand jury in January, 2008, when the indictment was superceded. Again, the grand jury that heard the evidence as it relates to the superceding indictment was an entirely different grand jury than heard the evidence from the earlier presentation so the Government fails to see what prejudice the Defendant could have possibly suffered when the information he complains of was not given to the later grand jury . Regardless, the government submits that there was nothing improper in it's establishing an element of the offense before the grand jury.

Mr. Robare makes a second argument on this point. He suggests that as the criminal history was reviewed that the Government intentionally failed to disclose to the grand jury that his Robbery First Degree conviction had been overturned. The Defendant was previously convicted of both Robbery First Degree and Attempted Sodomy First Degree. Both charges arose out of the same incident and the Defendant received concurrent sentences on those convictions. At the time of the initial presentation of evidence as it related to the original indictment, the Government utilized the information set forth in the criminal history which made no mention or reference of any kind that the conviction of the robbery had been overturned. In

20

regards to his being federally prohibited, the Defendant had numerous other convictions establishing that fact. During the course of his investigation Agent Meeks obtained certificates of conviction for the Defendant's felony convictions, at which time he learned that the Robbery conviction had been overturned. Agent Meeks even obtained a court transcript from when the defendant was returned from state prison and the conviction was dismissed. The Government provided all those materials to the defense. The Government did not have that information at the time of the original grand jury presentation. When we learned of that information we provided it to the defense. When the case was superceded that information was not provided to the new grand jury. That the Defendant now complains of this seems outrageously disingenuous. He even made this same argument and allegation in a motion for reconsideration of his bail status before Magistrate Judge Homer on June 3, 2007.

At pages 13-17 of his motion, the Defendant argues that knowingly false information was presented and testified to by Agent Meeks in that Agent Meeks testified that the gun that was located in the trailer where the Defendant had been arrested, was a .20 caliber shotgun. In the superceding indictment, the defendant was indicted for possessing the same firearm but it was accurately identified as a .16 caliber with serial number. Again, the Defendant intersperses allegations referencing both the August 22, 2007 and the later January 31, 2008 grand jury. He draws no distinctions between the two separate presentations. When the original presentation was done Agent Meeks testified that his information came from what he had been informed of by the state troopers involved in the case and that they indicated they had recovered a .20 caliber shotgun. In fact, a .20 caliber shotgun shell was actually loaded in the gun. The police and property reports Agent Meeks had been provided with and reviewed indicated that state police recovered a .20 caliber shotgun. Agent Meeks testified that at that time he spoke with Michael Knapp, who is an ATF firearms examiner who indicated to him that Crescent shotguns were manufactured by the Armory Gun Company who only made guns in Norwich, Connecticut and that it would have been manufactured somewhere between 1904 and 1920. That is the information Agent Meeks had and that is what he testified to. There was no knowingly false testimony given by Agent Meeks. Later, as part of his investigation, Agent Meeks took custody of the gun from the state police. Upon his examination, he did not think that the gun was .20 caliber though the differences in the diameter of the calibers is minimal. In terms of the age of the weapon, the caliber is not listed on it. Agent Meeks sent the gun for further ATF examination, and it was verified to be .16 caliber. The gun was still manufactured in Norwich, Connecticut and the later examiner, Mike Powell, indicated that the .16 caliber gun was manufactured in 1899. Moreover, when the gun was examined by ATF forensics for prints and DNA, which were negative, tape was removed and a serial number was located. Hence, when the indictment was superceded Agent Meeks testified to the more accurate information which differed from his earlier testimony. There was hardly any knowingly perjured testimony and it seems like an extraordinary "stretch" to suggest so.

The Defendant also argues that it was perjured testimony or intentionally misleading testimony for the Government to identify the gun as .20 caliber with no serial number at the time of the first indictment on August 22, 2007 because it did not reveal to the federal grand jury the

21

testimony of Police Officer JD Cook who testified before the state grand jury (he had test-fired the gun) that the gun was .16 caliber.  As outlined above, the federal Government did not possess the state grand jury testimony of any of the witnesses until January 16, 2008 at the time of the suppression hearing.  When the case was superceded on January 31, 2008 Agent Meeks provided the accurate details of the caliber of the gun and the existence of the serial number.  The report that Mr. Robare refers to at page 16 of his motion wherein Agent Meeks refers to the .16 caliber gun was a report of investigation by Meeks in October, 2007 when he took custody of the gun from the state police, well after the August, 2007 original grand jury presentation.

In his motion, at pages 19 and 20, Mr. Robare again argues that Agent Meeks and the Government should have made the August, 2007 grand jury aware of what Wendy Robare testified to before the state grand jury.  We were not in possession of that testimony which we did not obtain until January 16, 2008.  Agent Meeks testified to what the state police told him Wendy Robare told them on July 20, 2007.  There certainly was no misrepresentation from Agent Meeks.

It is difficult to know whether it is necessary for the Government to refute each and every factual allegation made by Mr. Robare.  Certainly, as we have indicated, we deny his allegations. We submit to the Court that we do not believe that he has set forth any sufficient basis or met any burden he would have that would entitle him to a hearing on these issues and relief therefrom.

Again, at pages 26 and 27, Mr. Robare comes back around to Agent Meeks description of what April Robare had reported.  Mr. Robare seems to be selectively looking at portions of only certain of her statements.  Mr. Robare seems to suggest that she had not identified the gun as a sawed off shotgun.  Agent Meeks was summarizing the evidence and referring to all the statements given by her along with the interviews conducted.  She had certainly informed authorities, particularly as she identified the gun on August 6, 2007, that it was sawed-off.  She knew whom he had gotten the gun from and indicated she saw the defendant saw the gun down. As we have stated previously, we fail to see where Agent Meeks or the government misrepresented or mischaracterized the information provided by her.

Mr. Robare alleges further prosecutorial misconduct that the prosecution did not have sufficient grounds in which to supercede the indictment.  The indictment was superceded with charges modified, additional charges added, and legitimate evidence explored.  On the one hand, Mr. Robare complains of evidence not being presented during the earlier grand jury presentation. His arguments lack merit and are not sufficiently supported such that we submit that he is not entitled to a hearing and certainly not entitled to the relief he seeks- dismissal of the indictment. Nonetheless, when baselessly accused of impropriety the Government believes it appropriate to comment and respond.  Mr. Robare's contentions fail for a variety of reasons.  First, if there was some kind of error in the first proceeding, which we do not believe there was, in view of the evidence presented that error would be harmless.  Second, the indictment was superceded with the later presentation of evidence submitted to an entirely separate grand jury, so even if one were ever inclined to view this through Mr. Robare's prism, which we do not, we cannot fathom

how the later grand jury would have been prejudiced. Mr. Robare complains, in part, that the grand jury was not informed, on issues of ownership of the trailer, that his sister had previously testified before an earlier state preliminary hearing and state grand jury, that he owned the camper instead of her. That issue seems more relevant as to the framing of pre-trial issues in the case where the Defendant previously moved to suppress the gun and submitted an affidavit under penalty of perjury that the camper was his, thus providing him with standing and/or an expectation of privacy in the camper such that he could bring the motion to suppress. He argues prejudice from that issue but that issue does not seem highly relevant to the issue of possession of the firearm and ammunition, so again, the government does not really follow his train of thought or see how the integrity of the grand jury was impaired. The Court observed some of this at the suppression hearing at which his sister was a witness. There, ownership of the camper and more specifically, her providing consent to the police to search it, was the issue. As the Court recalls, she testified that the camper was, in fact, hers and acknowledged that she had previously testified in state proceedings that the camper was his. She indicated that she had perjured herself and had done so on behalf of her brother. Again, Mr. Robare complains that information was not presented to the first grand jury in August, 2007, when the government neither had nor was even aware of that fact, and he still complains and sees bogeymen when she was actually called before the second grand jury and provided that information. The second grand jury was even told by her that she had given contrary testimony in earlier state proceedings, so the information he wants developed was presented.

What Mr. Robare wants to develop, it seems to the Government, are issues appropriately addressed at trial. He wants to explore her earlier statements to police as contrasted with later statements given. It seems obvious to the Government that he wants to argue that she initially told the truth and later changed her story as a result of police pressure. By all means, he can explore those issues and it will be for the trial jury to resolve issues of credibility.

We see no basis for dismissal of the indictment. This particular motion was essentially already brought by him in DKT 35. He claims he is presenting different, new information having been provided with the actual minutes by the Government, but the Government does not believe that to be so. His motion is based on his characterization of the facts and evidence, which we do not agree with, which are issues to be resolved at trial. The Court already ruled upon and denied this motion with it's decision in DKT 45. The Defendant did not respond in a timely fashion, and it seems to the Government, that if the Court wanted to deny the motion on that basis, it could do so. Obviously, the Government has nonetheless gone through the motion "point by point". We have done so because we think it appropriate to respond when the accusation is dishonesty and misconduct. Mr. Robare's contentions do not have merit. That is not to say that there are not issues of things witnesses have stated at different times that he can address in cross examination and argue in summation, but there was no subornation of perjury or false testimony given.

If considered by the Court, the motion should be denied. Nor do we believe he has met any burden that would entitle him to review of the legal instructions given. A facially valid

23

indictment precludes dismissal based on the allegation that the prosecution presented the grand jury with erroneous legal instructions.  See United States v. Dunn, 05-CR-127KMK, 2005 WL 1705303, *3 (S.D.N.Y. July 19, 2005).

## DKT 59

Mr. Robare brought an additional motion to dismiss dated May 13, 2008, and entered on the docket on May 16, 2008.  The Government contends that the motion is untimely, without merit, and should be denied.

The Defendant has moved to dismiss all counts in which the firearm is charged, that is, Counts 1-3.  Counts 1 and 2 charge Title 26 violations under the National Firearms Act (NFA).  Count 3 charges possession of the shotgun as a previously convicted felon under Title 18.

On April 18, 2008 the Government provided numerous materials to the Defendant, including the Report of Examination by Firearms Enforcement Officer Michael C. Powell who is with the ATF Firearms Technology Branch.  That letter is on the docket (DKT 50).  Mr. Robare has attached that Report of Examination to his motion as Exhibit A.

Mr. Robare subsequently wrote directly to Mr. Powell simply inquiring as to the source of Mr. Powell's information (the Government is not alleging nor insinuating that there was anything improper in Mr. Robare sending a letter to Mr. Powell).  Mr. Powell, in turn, provided various materials to the Government which we then sent to Mr. Robare on May 2, 2008.  That letter is also on the docket (DKT 55).

In addition to his own knowledge, and based upon his experience, Mr. Powell also utilized portions of texts, including: (a) "The Breechloading Shotgun In America, 1860-1940, Vol. I" by Joseph T. Vorisek, and (b) "Side by Sides of the World for Y2K" by Charles Carder.  Subsequent to his determination that the subject firearm was manufactured in 1899, and in anticipation of trial of this matter, Mr. Powell also obtained a copy of previous trial testimony given by Mr. Vorisek in a federal district court on or around 1996.  Mr. Powell sent this transcript to the Government, which we sent to the defendant in the May 2, 2008 letter to Mr. Robare.

Based upon these materials, Mr. Robare has filed motion that the firearm in question is an "antique firearm" and, though we are not certain it is made clear in his motion, we believe he argues that Counts 1-3 should be dismissed.  Mr. Robare may be partly right and it may be that Count 3 is subject to or may be subject to dismissal or that Count 3 would be subject to a Rule 29 dismissal at trial.  Mr. Powell's information in his Report of Examination is that based upon his review of various materials, including and primarily Mr. Vorisek's text, that Mr. Powell's review of various tables in the text regarding this manufacturer, that the firearm was manufactured in 1899.

Mr. Robare's motion does not account for the different standards applicable to Title 18 as contrasted with Title 26 charges.  Counts 1-3 all pertain to Mr. Robare's alleged possession of the same firearm.  However, Counts 1 and 2 allege violation of Title 26 whereas Count 3 alleges violation of Title 18.  There are differences in the law for each Title.

## Counts 1 and 2

Section 5861(c) of Title 26 U.S.C. makes it unlawful for a person to possess a firearm made in violation of the provisions of the NFA.

Section 5861(d) of Title 26 U.S.C. makes it unlawful for a person to possess a firearm that is not registered to him in the National Firearms Registration and Transfer record.

For Title 26, the term "firearm" is defined in 26 U.S.C. § 5845(a), which provides: The term firearm means: (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; ...  The term "firearm" shall not include an antique firearm or any device (other than a machine gun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

The National Firearms Act (NFA), 26 U.S.C. § 5845(g), defines the term "antique firearm" to mean:

> any firearm not designed or redesigned for using rim fire or conventional center ignition with fixed ammunition and manufactured in or before 1898 (including any matchlock, flintlock, percussion cap, or similar type of ignition system or replica thereof, whether actually manufactured before or after the year 1898) and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

The exclusion of antique firearms and collector's items from the NFA reflects a congressional concern that the firearms not unnecessarily interfere with the interests of institutions such as museums and persons engaged in the hobby of collecting antique guns.  See H.R. Rep. No. 90-1577, at 9 (1968), reprinted in 1968 U.S. Code Cong. & Admin. News 4410, 4415.

In fact, the Second Circuit has concluded that the issue of whether a gun is an antique within the meaning of the NFA is a question of law to be decided by the court.  United States v. Tribunella, 749 F.2d 104, 111 n.5 (2d Cir. 1984).

The definition of "antique firearm" creates two categories of antiques. The first, described in the clause preceding the parenthetical, focuses chiefly on the design of the weapon. The second, which follows the parenthetical, deals with the availability of ammunition for the weapon at issue.

The first portion of the definition of an antique firearm excludes any weapon that is designed to use conventional center fire ignition with fixed ammunition. Such a design feature is readily apparent to expert witnesses. With respect to the second part of the definition, the defendant in Tribunella construed the statutory language to mean that, if ammunition designed for the firearm at issue is not presently manufactured or commercially available, that the firearm is an antique within the meaning of § 5845(g). The Second Circuit rejected the defendant's argument, and concluded that § 5845 (g) excludes from the definition of antique any firearm for which any usable ammunition is readily available in ordinary channels of commerce, regardless of whether such ammunition was specifically designed for the weapon at issue or some other weapon. Id. at 108-11. As explained by the Court:

> In light of Congress' evident intent to regulate weapons that are not unlikely to be used as weapons, we conclude that § 5845(g)'s final clause should not be interpreted as though it referred solely to ammunition designed specifically for the pre-1899 firearm. If ammunition made for other weapons is readily available in commercial channels and is usable in a pre-1899 firearm, it cannot safely be inferred that the pre-1899 firearm is never likely to be used as a weapon. We thus conclude that § 5845 does not exempt such a firearm from the requirements of the National Firearms Act.

Id. at 111.

## Count 3

For Title 18 charges, "firearm" is defined in 18 U.S.C. § 921(a)(3) and means, among other things listed, "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Under the definition there it states, "Such term (firearm) does not include an antique firearm. For Title 18 charges, the definition of "antique firearm" is listed in 18 U.S.C. § 921(a)(16) and is somewhat different than the definition in 26 U.S.C. 5845(g) for Title 26 weapons. Under 18 U.S.C. 921(a)(16) "antique firearm" is defined as, among other things also listed there, "(A) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898."

For Title 18 litigation, Courts have required defendants seeking acquittal on this ground to "raise a genuine dispute about whether the firearm is an antique" before shifting the burden of proving that it is not an antique to the government. United States v. Washington, 17 F.3d 230, 232 (8th Cir. 1994); United States v. Larouche, 723 F.2d 1541, 1543 (11th Cir. 1984) (involving statutory precursor to § 922(g)(1)).

26

First, Mr. Robare alleges that the gun is an antique firearm.  That is not certain.  It may be that the gun was manufactured in 1897, 1898 or 1899.  Based on the serial number of the gun, Mr. Powell believes it likely that the gun was manufactured in 1899 but having subsequently reviewed the earlier trial testimony of Mr. Vorisek, in which he conceded that the compilation of the tables utilized by him had built in certain assumptions and estimates since it is not known with certainty how many firearms were manufactured by Crescent Firearms Company in each of these three years.

Mr. Powell brought this to our attention and provided a copy of the Vorisek testimony which we have provided to the Defendant.  That this gun might have been, or even if it was likely, manufactured in 1899, inures not to the benefit of the Government but to the likely advantage of Mr. Robare.  For, if there is a genuine factual dispute, which there appears to be here, the burden then shifts to the Government to prove that it is not an antique firearm.

However, the Government submits to the Court that the analysis does not end there.  The definition of antique firearm for Title 18 charges (Count 3) is set forth in 18 U.S.C. § 921(a)(16).  For a Title 18 violation if the firearm is manufactured in 1998 or earlier, it is considered to be an antique firearm no matter what, and a Title 18 charge cannot be sustained.  The definition of antique firearm for Title 26 charges is somewhat different.  Moreover, these issues have been litigated in the Second Circuit.  As set forth above, the definition for antique firearm as applicable to Title 26 charges is found in 26 U.S.C. 5845(g).

There are various points or issues which would seem to flow from the law under Tribunella which seem applicable here to Mr. Robare's case.  In footnote 5 it appears that the Second Circuit has held that the question of whether a firearm is an antique is a question of law for the Court to decide.  The Government submits that Mr. Robare's motion is premature.  It may be that this issue can be settled or decided during the course of the trial.  It may be that the Court desires to settle this issue as a matter of law, but prior to trial, via hearing.

The Government has discussed this issue with Mr. Powell.  If we cannot definitively show (or establish this element (of Count 3) beyond a reasonable doubt), then Count 3 cannot stand and would not get past even a Rule 29 motion at trial.  Practically speaking, even if under the law or in the Court's view, the Government would be within it's right to present its evidence at trial and that this motion "ripens" at the point in time when the defendant could bring a Rule 29 motion, the Government would not elect to proceed in that fashion.  If Mr. Powell is not able to present more definitive or persuasive proof on that point, that the gun was manufactured sometime after 1898, the Government will move to dismiss Count 3 prior to trial.  However, in terms of what is out there presently, Mr. Robare's motion seems premature.  Mr. Powell's present view is that he believes it likely that the gun was manufactured in 1899 based on his review of sources which includes Mr. Vorisek's text.

However, we submit that this firearm does not meet the definition of antique firearm under 26 U.S.C. § 5845(g) that applies to Title 26 weapons, which this is in terms of its

27

modifications, regarding both its barrel and overall length which is also reflected in Mr. Powell's report (Defense Exhibit A). As is also set forth in Exhibit A Mr. Powell test-fired this weapon with both commercially available .16 caliber and .20 caliber ammunition. It's a .16 caliber gun though it was loaded with .20 caliber ammunition. While we understand that Mr. Robare will dispute the following at trial, it is anticipated that his nephew will testify that he gave the gun to his uncle and that he thought it was a .20 caliber shotgun, that he called it a .20 caliber shotgun, and that his uncle thought it was a .20 caliber shotgun. The state police when they recovered the shotgun thought it was a .20 caliber shotgun and logged into evidence as such. Because of the age of the shotgun the caliber is nowhere listed on the gun. The difference is relatively minimal (a matter of millimeters) regarding the diameter of the barrels between the 2 calibers. Also, there was a .20 caliber shotgun shell loaded in the gun when it was recovered by the police. When ATF SA Mark Meeks obtained the gun from the police he believed the gun to be a .16 caliber, not .20 caliber. Therefore, Agent Meeks in sending the gun to the FBI lab requested, among other things, that Mr. Powell attempt to fire both .16 and .20 caliber ammunition from it. Mr. Powell did so, successfully, and as his report indicates utilized commercially available ammunition to do so. See Defense Exhibit A (FEO Powells's Report of Examination).

It may be that Mr. Robare concedes this, if only for purposes of the pre-trial motion he filed, that with .16 and .20 caliber commercially available ammunition being fired from the gun, that under the law as set forth in Tribunella that there is no basis for dismissal of the Title 26 charges in Counts 1 and 2. Regardless of Mr. Robare's position, we ask that the Court make that finding and deny the motion. We do not believe that Mr. Robare is necessarily entitled to a hearing on this issue. He has attached the Report of Examination to his motion. We are attaching an additional copy to our response. The Rules of Evidence do not apply to a pre-trial hearing (FRE 1101(d)(1)) and hearsay is admissible so it would be our intention to offer the report that settles the issue regarding the use of commercially available ammunition with the firearm rendering it not antique under Title 26 regardless of its date of manufacture. If the Court believes that Mr. Robare is entitled to a hearing on the issue, or wishes to take testimony form Mr. Powell, particularly as it relates to any issues attendant to Count 3, we will, of course, make Mr. Powell available.

Furthermore, in Tribunella the firearm in question was designed for using conventional center fire ignition with fixed ammunition, 749 F.2d at 108, so the defendant did not argue that point and only argued the "ammunition" second prong which the Court rejected. The point is, under the NFA, a firearm is not antique if either of those things apply, that is, (a) if the firearm was designed for conventional center fire ignition with fixed ammunition, or (b) if the firearm uses fixed ammunition readily available in the ordinary channels of commercial trade. Under both those standards, the firearm in question in Mr. Robare's case, is not antique for purposes of Title 26.

There is no basis to dismiss Counts 1 and 2. The Superceding Indictment, as it pertains to all 3 counts, including Count 3, is facially sufficient; hence, his motion even as it relates to Count 3, is premature. It is well-settled that a challenge to the factual sufficiency of charges contained

in an indictment should not be made by a motion to dismiss the indictment before trial but by a motion for a judgment of acquittal at trial at the close of the government's case-in-chief.  Rule 29(a), Federal Rules of Criminal Procedure; United States v. Ambers, 416 F.2d 942, 943 (5th Cir. 1969), cert. denied, 396 U.S. 1039 (1970).  As stated by the Supreme Court in Costello v. United States,

> If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed.  The result of such a rule would be that before trial of the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for a trial on the merits.

350 U.S. 359, 363 (1956).  See also, United States v. Gallagher, 602 F.2d 1139, 1142 (2d Cir. 1979), cert. dismissed, 444 U.S. 1040 (1980) (sufficiency of an indictment may not be properly challenged by a pretrial motion on the ground that it is not supported by adequate evidence).

While motions to dismiss are generally inappropriate mechanisms to assess evidentiary sufficiency a court must examine the indictment as a whole, accept as true the facts alleged, and determine only whether the indictment is valid on its face.  Costello v. United States, 350 U.S. 359, 363 (1956); Walsh at 44; United States v. Alfonso, 143 F.3d 772, 777 (2d Cir. 1998). Insufficiency of evidence is not a ground for dismissal.  It is well-established that an indictment that is complete on its face is not subject to challenge on the ground that the evidence presented to the grand jury was legally insufficient.  See United States v. Calandra, 414 U.S. 338, 344-45 (1974); Lawn v. United States, 355 U.S. 339, 349-50 (1958).

## CONCLUSION

_____For the above-stated reasons, the Government respectfully request that the Defendant's motions be denied.

Dated: June 6, 2008

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

           v.

                                              Case No. 07-CR-373 (FJS)

ROGER ROBARE,

                Defendant.

_____

CERTIFICATE OF SERVICE

       I hereby certify that I electronically filed this Government Response in Opposition on Friday, June 6, 2008.  Email notification was sent to standby counsel:

       Timothy E. Austin, Esq.
       Assistant Federal Public Defender

       A copy was mailed to the Defendant, Roger Robare, on Monday, June 9, 2008, at the address set forth below:

       Roger Bruce Robare, Jr.
       Inmate # 14540052
       Albany County Jail
       840 Albany Shaker Road
       Albany, NY 12211

                         /S/_____
                         Robert A. Sharpe
                         Assistant U.S. Attorney
                         Bar Roll No. 302573